UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TOMMY HO,<br>10 W Bay State Street, #454,<br>Alhambra, CA 91802,<br><br>    *Plaintiff*,<br><br>v.<br><br>WILLIAM P. BARR,<br>in his official capacity as<br>ATTORNEY GENERAL OF THE<br>UNITED STATES,<br>U.S. Department of Justice,<br>950 Pennsylvania Avenue, NW,<br>Washington, D.C. 20530,<br><br>    *Defendant*. | Civil Action No. _____<br><br><br><br><br>Jury Trial Demand |

**COMPLAINT FOR**
**RELIEF FROM VIOLATIONS OF TITLE VII**

**Nature of Claim**

1. Plaintiff Tommy Ho brings this civil action against William P. Barr, in his official capacity as Attorney General of the United States, U.S. Department of Justice ("DOJ"), under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as amended, for relief from discrimination on the basis of his race (Asian American), and for retaliation suffered when Defendant reassigned him to the Joint Support Operations Center ("JSOC") and denied his transfer to the Las Vegas Field Office ("LVFO").

**Jurisdiction and Venue**

2. This Court has jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. §§ 1331 and 1343; 42 U.S.C. § 2000e-5(f)(3).

3. The Court may assert jurisdiction over Defendant because, at all times relevant to

this Complaint, Plaintiff worked for Defendant in the District of Columbia ("D.C." or "District") at the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"): 99 New York Avenue, NE, Washington, D.C. 20226. D.C. Code § 13-423(a)(1); Fed. R. Civ. P. 4(k)(1)(A).

4. Venue lies in this Court because Plaintiff was employed by Defendant in the District of Columbia, all of the discriminatory actions and decisions took place in the District of Columbia, and the records concerning Plaintiff's employment are maintained in the District of Columbia. 42 U.S.C. § 2000e-5(f)(3).

### Description of the Parties

5. Plaintiff is a citizen of the United States and a resident of the state of California. Plaintiff began his employment with Defendant in April 1999 and is currently employed by Defendant as a GS-1811-13 Criminal Investigator.

6. Defendant William P. Barr, serving as Attorney General of the United States and the head of the DOJ, has his office in the District of Columbia. He is sued only in his official capacity. The DOJ is an Executive department, 5 U.S.C. § 101, and an "agency" within the meaning of 5 U.S.C. § 701. ATF is a subordinate component of the DOJ pursuant to 28 C.F.R. § 0.1. At all times relevant to this action, Defendant employed more than 15 employees and is subject to Title VII. 42 U.S.C. § 2000e(b).

### Exhaustion of Administrative Remedies

7. Plaintiff filed an informal discrimination complaint on June 1, 2015, and timely filed a formal complaint on the matters raised in this Complaint on August 14, 2015.

8. The U.S. Equal Employment Opportunity Commission ("EEOC"), Office of Federal Operations ("OFO") issued a decision on Plaintiff's equal employment opportunity ("EEO") complaint on January 8, 2020.

9.      Plaintiff has timely filed this suit within 90 days of his receipt of the EEOC's Decision. 42 U.S.C. § 2000e-16(c).

## Statement of Facts

### *Plaintiff's Employment with Defendant*

10.     Plaintiff began his career with ATF in April 1999. In August 2012, Plaintiff accepted a position with a three-year commitment in the Special Operations Division ("SOD"), Technical Operations Branch in the Unmanned Aircraft Systems ("UAS") Program at ATF Headquarters ("HQ").

11.     In June 2014, the SOD suspended the UAS program, and Plaintiff was involuntarily transferred to the Washington Field Division ("WFD").

### *Involuntary Reassignment to the JSOC*

12.     On April 30, 2015, Plaintiff was involuntarily transferred from his Senior Operations Officer ("SOO") position in the WFD to a GS-1811 Special Agent ("SA")/Project Officer position in the JSOC, in the Office of Strategic Intelligence and Information ("OSII"), effective May 17, 2015.

13.     The JSOC is considered a punishment position and is a difficult assignment to fill. Agents seeking to advance and gain experience in the agency do not find the JSOC position desirable. The JSOC SA position to which Plaintiff was involuntarily reassigned is clerical in nature. Plaintiff's primary responsibilities included answering phones and conducting history checks.

14.     Assistant Director ("AD") of Field Operations Michael Gleysteen and Deputy Assistant Director ("DAD") Marino Vidoli instructed Acting DAD Essam Rabadi to reach out to the WFD about backfilling the JSOC. On their instruction, DAD Rabadi directed Special Agent

in Charge ("SAC") Charles Smith to provide him with the names of two "candidates that fit the criteria for a transfer to the JSOC."

15. On April 22, 2015, Plaintiff's first-line supervisor, SAC Smith informed Plaintiff that HQ had directed SAC Smith to transfer an agent to the JSOC. According to SAC Smith, HQ told him to select an agent who was assigned to the position of Division Tactical Advisor, Intel Officer, or SOO, or who was the subject of a pending internal affairs investigation. Despite HQ's request for two names, and six other agents meeting the criteria for consideration, SAC Smith forwarded only Plaintiff's name, which resulted in Plaintiff's transfer to the JSOC.

16. When Plaintiff was first involuntarily reassigned to the WFD, he met with SAC Smith, who described his prior experience supervising SA Casey Xiong (Asian). Specifically, SAC Smith described SA Xiong as good at administrative duties, but not as assertive as other agents. SAC Smith made this comparison between SA Xiong and Plaintiff based on their race, reflecting a stereotypical view of Asians. Plaintiff and SA Xiong are both first-generation Asian immigrants, with English as a second language.

17. In December 2014, SAC Smith invited Plaintiff and two other agents to join his family for Christmas Eve dinner. Plaintiff was not able to attend this dinner. In the following weeks, SAC Smith openly stated that Plaintiff declined his invitation because, "Tommy did not want to go to a black man's house." SAC Smith repeated this statement at least twice in front of Plaintiff and other WFD staff.

18. Following allegations of inappropriate behavior on an unrelated matter, SAC Smith was investigated and subsequently demoted. The allegations against SAC Smith included discrimination against a female agent and misuse of credit cards.

19. Besides Plaintiff, only one other SA was involuntarily reassigned from the WFD.

Unlike Plaintiff, however, this agent's reassignment was part of a disciplinary move for conduct unbecoming an agent, which involved criminal allegations.

20. On or about April 30, 2015, AD Gleysteen signed the selection memo transferring Plaintiff from the WFD to the JSOC. AD Gleysteen informed AD McDermond that Plaintiff was coming to the JSOC.

21. When a SA comes on board, it is AD, OSII James McDermond's practice to meet with him, usually within the first few weeks of his arrival. AD McDermond did not meet with Plaintiff.

22. According to AD McDermond, an agent is only involuntarily transferred to the JSOC if there are no voluntary candidates for the position. At the same time Plaintiff was involuntarily reassigned to the JSOC, SA Michael Jacobi had volunteered to work in the JSOC. Additionally, agents whose conduct could result in them being impeached while testifying in a criminal trial or who can no longer testify because of credibility concerns (referred to as Giglio issues), are moved to HQ assignments in Washington, D.C. until their conduct and credibility issues are resolved. Brent Price was identified by DAD Vidoli as a potential candidate for the JSOC because he had Giglio issues.

*Commencement of the EEO Process*

23. On June 1, 2015, Plaintiff filed an informal EEO complaint alleging race discrimination and reprisal based on Defendant's decision to involuntary reassign him to the JSOC. Plaintiff's requested relief was to return to the LVFO.

*Denied Transfer to the LVFO*

24. On June 9, 2015, Plaintiff met with his third-, second-, and first-line supervisors, Division Chief of the Violent Crime Intelligence Division Kevin O'Keefe, Deputy Chief of the

Criminal Intelligence Division Jose Vazquez, and Branch Chief of the JSOC Bryan Washington to request information about his assignment to the JSOC and discuss a reassignment to an office in the San Francisco Field Division ("SFFD"). Plaintiff indicated that he was interested in returning to the LVFO, having previously worked in that office. Plaintiff was told that his request would be relayed to upper management for further consideration and action.

25. On June 17, 2015, EEO Specialist Brenda Bryant conducted Plaintiff's initial EEO interview.

26. Between June 17, 2015 and July 24, 2015 (when the Notice of Right to File was issued), Bryant contacted Washington (first-line supervisor) regarding Plaintiff's EEO complaint. Washington instructed Bryant that all questions regarding Plaintiff should be directed to O'Keefe (third-line supervisor). During this discussion, Bryant informed Washington of Plaintiff's claims and his desired remedy of returning to the LVFO.

27. Washington conveyed this information to O'Keefe, who told him to stand by and wait for further instruction. Washington also advised Vazquez (second-line supervisor) about Plaintiff's EEO complaint.

28. As instructed by Washington, Bryant contacted O'Keefe directly regarding Plaintiff's EEO complaint and informed him of Plaintiff's claims and requested relief. O'Keefe told Bryant that he would discuss reassigning Plaintiff with AD McDermond. O'Keefe and Bryant did not discuss a resolution of the complaint.

29. After his discussion with Bryant, O'Keefe separately notified Vazquez and Washington about Plaintiff's EEO complaint. O'Keefe also spoke with AD McDermond regarding Plaintiff's complaint.

30. On July 28, 2015, Bryant conducted Plaintiff's final EEO interview. Plaintiff filed

a formal EEO complaint on August 14, 2015.

31. On or about August 15-16, 2015, Bryant called O'Keefe to tell him that Plaintiff had filed a formal EEO complaint. O'Keefe subsequently informed Vazquez and Washington that Plaintiff's complaint had become formal.

32. Even though O'Keefe had just been informed that Plaintiff filed a formal EEO complaint, he told AD McDermond that Plaintiff was contemplating filing an EEO complaint and that he was trying to help Plaintiff resolve the matter so Plaintiff would not file a formal complaint.

33. According to AD McDermond, there were numerous meetings between O'Keefe and him over the course of two to three days, and O'Keefe constantly updated AD McDermond on the status of Plaintiff's reassignment. During the course of these conversations, O'Keefe informed AD McDermond that the location of Plaintiff's transfer went from the SFFD (encompassing Northern California and the State of Nevada) to the San José Field Office.

34. Gleysteen, AD of Field Operations, told DAD, Western Region, Field Operations Luke Franey they were going to transfer Plaintiff from OSII to the San José Field Office, and he asked DAD Franey to move forward with the process.

35. O'Keefe informed AD McDermond that he was working with DAD Franey and OSII Chief of Staff Ernest Hickson to facilitate Plaintiff's transfer.

36. On August 20, 2015, DAD Franey informed Hickson, who in turn informed O'Keefe, that Field Operations could move Plaintiff to the San José Field Office that day if Plaintiff was willing to go there. DAD Franey identified SA Michael Jacobi as Plaintiff's JSOC replacement.

37. That same day, Washington informed Plaintiff that he was being offered an

assignment back to the SFFD, to the San José Field Office. Plaintiff indicated he could not go back to California because his extensive firearms collection was prohibited in the state. Washington shared the information about Plaintiff's firearms collection with O'Keefe, who then relayed this information to AD McDermond. O'Keefe told Hickson and DAD Franey that, because of Plaintiff's firearms collection, San José was not an option, and inquired if Plaintiff could go to Las Vegas.

38. DAD Franey informed O'Keefe that they would pursue the LVFO as Plaintiff's reassignment. O'Keefe advised AD McDermond and Washington that the LVFO was an option. AD McDermond directed O'Keefe to proceed.

39. Assistant Special Agent in Charge ("ASAC"), SFFD Deborah Livingston spoke with Plaintiff about transferring to the SFFD. ASAC Livingston was aware that Plaintiff's gun collection precluded him from returning to California and that Plaintiff was not interested in Reno; thus, Las Vegas was the remaining option in the SFFD.

40. On August 21, 2015, Vazquez and Washington asked Plaintiff about San José and Plaintiff reiterated that he could not go to California because of his firearms collection, which was prohibited in California, and indicated his interest in returning to Las Vegas.

41. DAD Franey contacted the Acting SFFD SAC, Eric Harden, incoming SFFD SAC Jill Snyder, and ASACs Livingston and Michel Delvecchio to inquire whether the LVFO would be a good option. A discussion regarding where in the SFFD to assign Plaintiff ensued. ASAC Livingston expressed that it would be a benefit to have Plaintiff back in the LVFO. ASAC Delvecchio agreed that, with the firearms collection issue, he had no objections to placing Plaintiff in the LVFO. Acting SAC Harden and SAC Snyder concurred.

42. SFFD leadership emphatically informed DAD Franey that Plaintiff was welcome

to return to the SFFD and that, given his gun collection, the LVFO made the most sense. Hickson notified Vazquez and Washington that Plaintiff could be assigned to the LVFO and asked them to inform Plaintiff.

43. Acting SAC Harden notified DAD Franey that the Field Division was good with Plaintiff returning to the LVFO. DAD Franey instructed the Field Operations Field Management Staff ("FMS") to initiate the Permanent Change of Station ("PCS") paperwork. Hickson subsequently requested coordination of the release date for Plaintiff to go to the LVFO and his replacement, SA Jacobi, to go to the JSOC. Branch Chief, Operations Support Branch Eileen Armentrout asked Angela Iaquinta, a Program Analyst in the FMS, Operations Support Branch, to prepare the reassignment action and selection memorandum for Plaintiff.

44. Washington informed Plaintiff that his transfer to the LVFO had been approved and he would verify with Hickson how soon they could get his orders cut so he would have the official documentation.

45. Iaquinta prepared the selection memorandum for Plaintiff's transfer on or about August 24, 2015, with an effective reassignment date of November 29, 2015. Iaquinta left the PCS file for AD Gleysteen's signature in a box at the front with his assistant, who then provided it to AD Gleysteen.

46. AD Gleysteen received SA Jacobi's PCS paperwork on August 24, 2015, and he signed it on August 31, 2015. AD McDermond signed the transmittal slip on September 8, 2015, and the selection was announced on September 9, 2015. Plaintiff and SA Jacobi had the same report date of November 29, 2015.

47. AD Gleysteen falsely claimed that he immediately denied Plaintiff's reassignment to the LVFO, even though he had already approved PCS funding for Plaintiff's reassignment to

the SFFD and SA Jacobi's reassignment to the JSOC to fill Plaintiff's position.

48. The PCS paperwork for Plaintiff comprised a selection notice with a PCS funding stamp, emails, and a routing slip on the front of the folder with initials and dates. The email chain included in Plaintiff's PCS file explicitly explained that the change in location within the SFFD was tied to Plaintiff's gun collection. Included in the email chain was Acting SAC Harden's response clearing Plaintiff for the LVFO.

49. AD Gleysteen admits that he destroyed the original and *only* copy of Plaintiff's entire PCS file by shredding it.

50. On September 3, 2015, Washington informed O'Keefe and Vazquez that Plaintiff's selection memorandum was on AD Gleysteen's desk awaiting signature.

51. That same day, ASAC Livingston discussed with Eunice Horiuchi, the Executive Assistant to the SFFD SAC, the report date and status of Plaintiff's transfer to the LVFO. ASAC Livingston contacted Plaintiff and asked if his reporting date was October 18, 2015, and Plaintiff in turn asked Washington to confirm his reporting date.

52. On September 10, 2015, Iaquinta informed Washington that the selection memorandum had not been signed yet, but that she expected it by the beginning of next week. Washington relayed this information to Plaintiff. Washington also informed Plaintiff that his report date was November 29, 2015, and Plaintiff notified ASAC Livingston of this fact.

53. On September 11, 2015, Vazquez informed Plaintiff that his PCS memorandum was with Field Operations pending signature.

54. On September 12, 2015, ASAC Livingston notified Plaintiff and his chain of command that the SFFD was willing to have Plaintiff report earlier than November 29, 2015, if agreeable to all parties. However, her request was denied because Plaintiff's replacement was

10

scheduled to report to the JSOC the same day Plaintiff was to report to the SFFD. ASAC Livingston notified Jason Grace, the first-line supervisor in the LVFO.

55. On September 11 or 14, 2015, O'Keefe advised AD McDermond that Plaintiff's reassignment had stalled and asked whether Plaintiff's EEO complaint was a factor. According to AD McDermond, Plaintiff's reassignment was tied to his EEO activity. After speaking with AD McDermond about the possible impact of Plaintiff's EEO complaint on his transfer, O'Keefe approached Agency counsel Aditi Sehgal to ask if that was a factor. O'Keefe believed Plaintiff's EEO complaint was the reason for the stalled reassignment, as there were no other issues, including funding, associated with Plaintiff's transfer.

56. Sehgal informed AD McDermond that AD Gleysteen had disapproved Plaintiff's reassignment to the LVFO.

57. On September 14, 2015, Sehgal asked Robyn Ferguson-Russ, the Acting Deputy Chief of EEO, where Plaintiff's EEO complaint was in the process and informed her that possible settlement discussions were occurring. Ferguson-Russ responded that Plaintiff's formal complaint was filed on August 14, 2015, and he did not have an attorney.

58. As a result of learning that AD Gleysteen had not approved Plaintiff's transfer to the LVFO, AD McDermond spoke with AD Gleysteen for the first time about reassigning Plaintiff and to ascertain whether the EEO complaint was a factor. AD Gleysteen informed AD McDermond that the only way he would authorize Plaintiff's move to the LVFO was if Plaintiff signed a settlement agreement resolving his EEO complaint.

59. On September 16, 2015, Vazquez called Plaintiff to tell him the selection memorandum still had not been signed.

60. On September 17, 2015, Bryant reached out to Plaintiff after being contacted by

Sehgal regarding the possibility of settlement.

61. On September 18, 2015, Bryant communicated AD Gleysteen's ultimatum that Plaintiff's transfer to the LVFO would only be approved if he signed a settlement agreement resolving his EEO complaint.

62. Ferguson-Russ left a voicemail for Plaintiff on September 18, 2015, regarding Defendant's settlement offer. When Plaintiff returned Ferguson-Russ's call, she informed him that he would only be transferred to the LVFO if he signed a settlement agreement and withdrew his EEO complaint.

63. On or about September 20, 2015, SA Jacobi's transfer orders to the JSOC were cancelled and he had to repay his PCS funds.

64. On September 25, 2015, Sehgal emailed O'Keefe and AD McDermond about Plaintiff. Based upon O'Keefe's response, she presumably notified them that Plaintiff was not willing to settle his EEO complaint for a transfer to the LVFO. That same day, O'Keefe notified Vazquez and Washington that Plaintiff would stay in the JSOC until further notice. AD McDermond told AD Gleysteen that Plaintiff was not willing to settle his EEO complaint.

65. No one informed Plaintiff that his transfer to the LVFO was cancelled.

66. On October 26, 2015, ASAC Livingston sought to confirm with Plaintiff that his report date was still November 29, 2015. Plaintiff told her he thought it had been cancelled.

67. On May 25, 2016, ASAC Livingston reached out to Plaintiff again and inquired whether the JSOC might let him return to the LVFO. Plaintiff expressed his interest, and ASAC Livingston indicated she would speak with the SAC. Plaintiff heard nothing further about transferring to the LVFO.

**Statement of Claims**

### COUNT 1
### RETALIATION
### IN VIOLATION OF TITLE VII

68. Plaintiff realleges and reincorporates paragraphs 10-67 of this Complaint.

69. Plaintiff's informal and formal EEO complaints regarding Defendant's discriminatory conduct constituted activity protected by Title VII.

70. Defendant's conduct in denying Plaintiff's transfer to the LVFO absent his agreement to withdraw his EEO complaint constitutes retaliation for engaging in protected activity.

71. As a result of Defendant's conduct, Plaintiff suffered damages including, but not limited to, pain and suffering, emotional distress, and humiliation.

### COUNT II
### RACE DISCRIMINATION
### IN VIOLATION OF TITLE VII

72. Plaintiff realleges and reincorporates paragraphs 10-67 of this Complaint.

73. Because of Plaintiff's race, on April 30, 2015, Defendant involuntarily transferred Plaintiff to the JSOC, effective May 17, 2015.

74. As a result of Defendant's conduct, Plaintiff suffered damages including, but not limited to, pain and suffering, emotional distress, and humiliation.

**Jury Trial Demand**

Plaintiff demands a jury trial of all claims triable to the jury.

**Prayer for Relief**

Wherefore, Plaintiff prays that this honorable Court enter a judgment which:

a. Declares that Defendant discriminated and retaliated against Plaintiff in violation

of Title VII;

      b.      Enjoins Defendant from future acts of discrimination and reprisal;

      c.      Directs Defendant to take such measures as are reasonable and necessary to ensure that unlawful employment practices like those described herein are eliminated and do not recur;

      d.      Awards Plaintiff compensatory damages for the injuries he has suffered, in an amount appropriate to the proof at trial;

      e.      Awards Plaintiff reasonable attorneys' fees and costs; and

      f.      Awards Plaintiff all other legal and equitable relief to which he may be entitled.

Respectfully submitted,

*Aaron H. Szot*

_____

Aaron H. Szot
D.C. Bar No. 1031661
Kalijarvi, Chuzi, Newman & Fitch, P.C.
818 Connecticut Avenue, N.W., Suite 1000
Washington, D.C. 20006
Tel.: 202-331-9260
Fax: 1-866-672-9495
ASzot@kcnlaw.com

*Attorney for Plaintiff*